Good morning, Your Honors, and may it please the Court, I'm Norm Watkins, and I'm here on behalf of the County of Orange and the former Sheriff. This case arises out of a First Amendment claim of retaliation against the Sheriff by one of his lieutenants, Lt. Bardzik, following the 2006 election for Sheriff. And it brings into play the Elrod exception to the constitutional ban on patronage dismissals. And this appeal is from the denial, it's an interlocutory appeal, and it's from the denial of summary judgment on the question of qualified immunity. The matter is still pending before the district court. Does it make any difference what the job description was of the plaintiff at the times you're talking about? Job description in the sense of written in, say, a memorandum of understanding or something like that. Start with his employment title, and then go to what he was actually doing, and then go to how much discretion was involved in either situation. Correct. And that's exactly where I was headed. As I said, there were two issues that really this appeal focuses on, and the first is precisely that. This case has a robust factual record concerning the plaintiff's actual job duties. He was a lieutenant in the Sheriff's Department. The facts that I'm relating now are all facts that are not in dispute. In fact, they were recited by the district court as facts he considered. When you categorize these facts, and I agree that the facts are different, tell me what his job description is as you're going through that sequence. Sure. The position that he held was, at the pertinent time, was division commander. He supervised the reserve division. And he exercised a high degree of discretion, right? He described his job as running the division. He supervised 600 members of the division. He reorganized the whole division as to carrying firearms, badges. Well, that was an issue. He developed a policy that he wanted to launch, which was controversial, and it involved the issue of training and whether the reserve deputies who didn't have adequate training under the peace officer's standards in California, whether they could continue to be reserve officers. He described his job as deciding throughout the department how to allocate resources from his division. Okay. Now, in contrast, he was reassigned to the courthouse detail, right? That's correct. Did he exercise the same degree of discretion in that job? Well, the record, frankly, is, I don't know if I want to say silent on it, but pretty close to silent. It seems to me that if you're on a courthouse detail, the idea is you lock them up in a holding cell, and when the trial court wants you to bring them in as a witness or for proceedings in court, you cuff them, you take them down the hall, you put them in the courtroom for the trial, and a deputy sits in the front seat and maintains the law and order, and then when the hearing's over, back to the cell he goes and back to prison he goes. Well, no, he was in charge of all of the deputies that did that. I understand. What's the policy problem in that job? Well, it's his job to develop the overall security program for that entire courthouse. He decides on how to staff, how to deploy, when they're going to have briefings, all of those kinds of things. The way I was looking at the record, it was pretty much a carryover. There were very few policy changes made during his administration. In which position? When he had the jail detail. Yeah. Candidly, the record is really not fleshed out on that because the focus in the district court, and I think rightly so, was on his position when he was transferred and whether he was a policymaker at that time, and that position was the reserve commander position. You're saying it was the transfer per se that triggered the litigation? It was. It was, and that's clear from the complaint. The chief had the authority to make these assignments on any basis he saw fit for the best interest of the job to be done. Well, I agree with that. So what's the civil rights claim? Well, the civil rights claim is, and candidly, I think there's case law to support the notion that a transfer that is disliked by a particular officer can be viewed as an adverse employment action, can be viewed as retaliatory under certain circumstances, and all those are matters to be fleshed out. It smells like it was punishment. It went out in support of the other guy. Well, there's no question. There's no question, and that's what the policymaker exception is all about, and that's why, as I said, this appeal presents two questions. Very simple. Number one, under the facts of this case, which are not in dispute and are recited at length by the district court, was the sheriff, on fair notice, that he could not remove Lieutenant Barczyk from his position because Lieutenant Barczyk was not a policymaker, and frankly, the only two cases in California that even come close to shedding any light on this are this court's decision in DeRouza and this court's decision in Thomas, and they're cited at length in the briefs. And the difference with DeRouza and the difference that the sheriff confronted is, in DeRouza, there was no factual record. In DeRouza, this court simply said that it was not going to be the law in this circuit that deputy sheriffs categorically were policymakers. Some states and some circuits hold that they are. And in Thomas, on a motion to dismiss, this court held that it was not inconceivable that a lieutenant in a sheriff's department could be actually not a policymaker. Now, the problem that I think the district court got into in this case is this. In this case, we have the facts. The district court then looked to this court's decision in Fazio and said, all right, I am implored to employ the Fazio factors and make a determination if the lieutenant is a policymaker. The court quite candidly couldn't do that and goes through that in the opinion. The court then presumed, for purposes of qualified immunity. Are you talking about Judge Selma now? I am. I am. The court then presumed that he was a policymaker, and we believe that was error. Well, the sheriff here, he had control of this department with 600 deputies. He was running that department with 600 deputies. Is that right? The lieutenant. The lieutenant. Yes, that's correct, Judge Gregersen. Okay. And he made a lot of changes. The lieutenant's a high rank. That's the highest one I ever achieved. Well, it's not the highest in the department, but it's the highest, quite frankly, that's been addressed. It's never supposed to be funny. But it's a huge responsibility. Of course. He had to reserve people, right? Correct. His job was to shake them up. His job was, in fact, the instructions given to him by his testimony was the sheriff met with him directly and said, take over the division, clean it up, get rid of the dead wood. Boom. Now, we can argue until we're blue in the face that this is a lot of discretion and everything else, but that's really not the point on the qualified immunity analysis. The point is that when the sheriff is confronted with all this, and frankly, his lawyers, because he got legal advice, and he looks at the case law and his lawyers. Who appointed those reserve deputies to begin with? Well, I'll tell you, there's been a lot written about it. I know I didn't, and I don't know who did. Yeah. Yeah, there's been a lot written about that. There's no question. He, in effect, tells this lieutenant, you know, I created a mess, you go clean it up. Well, we don't have that in the record. No, but it was a promotion. It was a promotion. May I just address one other point? Well, you know, as far as working with detail there, one of the big, well, there's discretion there, too, but you got to figure out what brand of coffee to serve. True, true. If I could just one point, and that is that on top of what I believe was a confusion by the district court of its job to decide the legal questions under FASIO with a factual finding about what the job duties were, because we have those facts. In addition to that, the district court laid out a First Amendment legal scheme that is absolutely unprecedented, not adopted by any court anywhere in the United States, and basically it takes Elrod two steps further. It says if the person is a policymaker, then the activity, the adverse employment action, will only be allowed if it, one, served a vital governmental interest and a legitimate governmental interest. Isn't that a jury question? Which is that? If someone's a policymaker. Absolutely not. Why not? Because this court says so. It did? That's why, yes, it did. I was not on that panel. It did. And I think that's where the district court, frankly, got off the reservation here. And it's not easy stuff, the First Amendment. But going back to- I mean, you've got a pretty brilliant district judge here, too. Absolutely. Yeah. And he worked very hard on this. There's no question about it. He was bombarded with mountains of paperwork, and I don't envy that job. And it's easy for lawyers like us to come in and criticize him afterward. He was an O'Melveny and Myers guy, too. Well, there you go. Just like this young man was. I remember him, the judge, when he was getting started. I knew you were looking at someone that was going to go a long way. Yeah. Anyway, as I pointed out, the legal framework is totally different, and that alone argues almost conclusively for qualified immunity. Thank you very much. Okay. Thank you. Good morning, Your Honors. May it please the Court, Josh Pioviscaz on behalf of the Pelley and Plaintiff, Lieutenant Jeff Bartzik. I want to respond to a couple of the points that were made in the first part of the hearing here. And the first is, as Your Honor pointed out, there is absolutely no evidence on the record that I'm aware of that Lieutenant Bartzik, in his position as lieutenant in court operations in Fullerton, which is one of the numerous courts that the Orange County Sheriff's work in, whether he was a policymaker in that position. There is no evidence of that. It's uncontested. And, in fact, a number of the retaliatory actions that former Sheriff Corona took against Lieutenant Bartzik occurred when he was in this position in court operations. But I do want to also address the position in the Reserve Division, which there is some evidence, overwhelming evidence, in fact, that he was not a policymaker in that position. But to answer Your Honor's question, as Reserve Division lieutenant, Lieutenant Bartzik supervised five full-time paid employees. Three of them were clerical staff, and only two of them were sworn officers. The other approximately 600 members of this division are part-time volunteers. And Lieutenant Bartzik, in his position in the Reserves, is an administrator. He's making sure that where reserves are needed throughout the department, they are sent. For instance, for example, reserves often serve as part of security for the Orange County Fair. And so the individuals in charge of that security detail contact the Reserve Division, get their reserves. Lieutenant Bartzik does not supervise them when they're helping to provide security at the Orange County Fair. He does not train them to provide security at the Orange County Fair. He's serving as an administrator to make sure that the reserves and resources are in the areas where they're needed in the department. And among other things- But didn't he establish the policies by which the selections were made? No, he did not. The personnel that were doing the physical selecting were answerable to him? As in charge of the Reserve Division, these part-time volunteers, he supervised the division and the individuals in the division, again, part-time volunteers. As I read the records, the division was quite in disarray when he was asked to take it over. There is no evidence that Lieutenant Bartzik, among other things, unilaterally or on his own, was instituted any policies within the Reserve Division. Every single thing that he did would have to go up the chain of command, and the assistant sheriff and the command staff in charge of the Reserve Division would have to okay this and make sure that it was able to be put in the Reserve Division. And even given that, there's very little, if any, evidence of these policies that Lieutenant Bartzik allegedly instituted in the Reserve Division. Now, he did take actions in the Reserve Division. And among other ones, there's evidence from his deposition that's before the court in the record in which he proposed to Sheriff Corona that then Sheriff Corona's political supporters and friends should not have the badge and the gun and the power of an individual in the Reserves. And at that point in time, Sheriff Corona told him, leave it alone. Those people are not to be touched. Those people are not to be having their reserve status taken away from them. And so, again, that points to the incredible limits of his power. But among other things, lieutenants in the Orange County Sheriff's Department, there's approximately 60 of them. They're separated from the sheriff by the ranks of captain, assistant sheriff, and undersheriff. And in the Reserve Division, the Reserve Division budget. No commanders in there? I don't believe so. Not in the Orange County Sheriff's Department. The budget of the Reserve Division was controlled by the assistant sheriff. Lieutenant Bartzik only had the ability to make approved expenditures of up to $300 within that division. How many deputies are there in Orange County? I don't know. There's hundreds and hundreds of deputies. There's 60 lieutenants, approximately 15 captains, four undersheriff, four assistant sheriffs, an undersheriff, the sheriff, there's sergeants below lieutenant, and then there's officers. Finally, one of the factors that- LA County has? LA County is very big. 10,000? Yeah. 12,000? So maybe there's even thousands of officers in the Orange County Sheriff's Department. Anyway, finally, among other the Fazio and DeRuza factors that this court appropriately applied, was that during this time period, Lieutenant Bartzik earned approximately $115,000 a year. And during these same years, assistant sheriffs in the Orange County Sheriff's Department earned upwards of $260,000, more than twice as much as Lieutenant Bartzik, and another indication that he wasn't one of the top members of the department. Going back to a number of the issues that were brought up by Appellate Corona, this court properly applied the Fazio and DeRuza factors that are developed in this court, that were developed by the Ninth Circuit, and I would submit to the court that the policymaker question in this case was not even close. Of the nine factors in DeRuza and Fazio identified as part of the policymaker analysis, only one of them, and I would submit that this was still subject to material fact and dispute, only one of them came down on the ledger of Lieutenant Bartzik being a policymaker in this reserve division position. The remaining eight did not indicate that he was a policymaker whatsoever, and it's clearly established as of 2005 when these decisions were made that the DeRuza decision was handed down in 1994. Thomas B. Carpenter was handed down in 1989. Elrod and Branty, the Supreme Court decisions on this subject, were handed down in the 70s and 80s. It was clear, it was clearly established to Sheriff Corona when he made these decisions in 2005, that Lieutenant Bartzik, even in this position in the reserve division, was not a policymaker and could not be acted against in retaliation for supporting Sheriff Corona's opponent in the election for refusing to support then-Sheriff Corona. When he was in that position, how often did he meet with the sheriff? That's a good point, and that's the one issue that the court found that may be indicative of Lieutenant Bartzik being a policymaker. You had conversations about administration. Yes. And the sheriff is directing and considering proposals, and they exchange their ideas, and then the lieutenant goes forward and implements them, right? Lieutenant Bartzik had a number of face-to-face conversations with Lieutenant, with then-Sheriff Corona. At least once a week. At times they were once a week, at times they were less than once a week. And I would submit that these are face-to-face discussions in which Lieutenant Bartzik is giving then-Sheriff Corona updates about what's going on in the reserve division. We're getting some question as to whether the sheriff approves or disapproves. True. The implementation is with the lieutenant, right? I agree. The lieutenant, and there's no evidence whatsoever that Lieutenant Bartzik ever failed in any way to implement any of Sheriff Corona's policies. And I think one of the issues in this question — Does the sheriff have a policy that he could go out and support other candidates for sheriff? No, that's protected by the United States Constitution. Okay. But to go to your question, I would submit that face-to-face meetings where you provide updates to the sheriff does not make one a policymaker. This is vastly different from reporting directly through the chain of command to the sheriff. But, again, I would submit that, A, there was material facts at issue regarding that one factor, which is the only factor the district court found in the nine policymaker factors that may have indicated that in this reserve division position Lieutenant Bartzik was a policymaker. Furthermore, the district court in this case, Judge Selna, went through these nine factors and spent pages and pages of his decision analyzing these nine factors and coming to the conclusion that for the purposes of summary judgment, Lieutenant Bartzik was not a policymaker. The court did not improperly presume, just immediately jumped to the fact that Lieutenant Bartzik was not a policymaker. And, in fact, did the factual analysis that is required by Fazio, DeRuza, and the other decisions in this circuit. And, finally, I'll address the last issue that appellants argue that Judge Selna took this leap of faith and created this whole new area of the law regarding the policymaker analysis. First and foremost, that question or that analysis of the potential weaknesses of the policymaker analysis that Judge Selna conducted had no impact whatsoever on his qualified immunity decision. If you review the couple of pages in the court's order regarding qualified immunity, there's no reference whatsoever to the question of whether this policymaker, the analysis that Judge Selna conducted about the potential weaknesses of the policymaker analysis. So it had no impact whatsoever on the district court's qualified immunity ruling. So as appellants can see, there's not a part of this appeal. But, furthermore, the court, I think, has some logic to where it was at least coming from. It said, for example, if there's a sheriff who has instituted a scheme of corruption and there's a policymaker, a clear policymaking individual who would like to address that or who has made that public or gone public with that, there's no reason that the sheriff should be able to retaliate and act to silence this policymaker just in furtherance of a scheme of corruption just because they're a policymaker. But regardless, the bottom line is that had no impact whatsoever on the court's qualified immunity holding. And that allegedly additional step of analysis also didn't impact the court's policymaker finding, as he found before engaging in that analysis that Lieutenant Barczyk was not a policymaker. As I explained, eight of these nine factors did not fall down on the policymaker side of the ledger. I'm happy to respond to any other questions the court has as well. But my time is up. Thank you, Your Honor. I think your time's up. It is. I would like to just address three points if I could. Twenty seconds, of course. Thank you very much, Justice Ferguson. First, Plaintiff himself claimed proudly, and I think he should, that he developed policy, a policy to replace the system of favoritism that existed in the Reserve Division, as are his words. He further developed a policy to oust all deputies that hadn't met the training requirements in that large division. Well, the sheriff wanted them to clean everything up, didn't he? Exactly. And that's about as much discretion as you can get. Well, he probably didn't have to think too much about all that. Big problems. Agreed. And he went to the lieutenant to have him fix it. He went to the lieutenant to do his dirty work. That division had been there a long time. And, of course, this evidence didn't focus on the development of the division, just the management of it. The final point is that counsel argues that Judge Selna held that even if a person is a policymaker, they can't be retaliated against or acted against if there's some kind of whistleblowing activity. And that is what Judge Selna held. The point in qualified immunity is no one else has ever held that. And, in fact, this court's decision in Bates, Bates v. Best, Best, and Krieger and Walker and Fazio says exactly the opposite. It says if the officer is determined to be a policymaker, that is the end of the inquiry on the civil rights act. Thank you very much. Finished on time. Could I respond to that with one point? Yeah, okay. He left you five seconds. I would just say that there is some evidence that Lieutenant Bardzig, regarding the vague or broad job responsibilities, and the fact that then-Sheriff Corona told him to go into the reserve division and clean it up, there's no evidence that those are the only job responsibilities that he had or that was the mandate that he had and that he could do anything he wanted within that incredibly broad mandate. As I pointed out earlier and as pointed out in the papers, it was an incredibly restrictive position in which the budget was run by the assistant sheriff. Lieutenant Bardzig was limited to less than $300 expenditures that he could okay. He wasn't allowed to, without the assistant sheriff's input, promote or provide evaluations for, again, these volunteer reserves within the reserve division. And last but not least, again, Selna's questioning of the policymaker analysis. What's that? Judge Selna. Judge Selna. I'm sorry, Your Honor. Judge Selna. Judge Selna's opinion or questioning of the policymaker analysis did not have any impact on the qualified immunity question. That's before the court today. And I thank you, Your Honor. Okay, thanks. That is submitted.
judges: Conlon, Pregerson, Beezer